**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **RACHEL DEPALMA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.  5:22-cv-91 (MTT)** |
| | ) | |
| **SAMANTHA KERNS, *et al.*,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Plaintiff Rachel DePalma—a self-proclaimed social media influencer and domestic abuse advocate—alleges Defendants Samantha Adamo (f/k/a Kerns),[1] Laurinda Kirk, and Tracy Korslund made statements in videos posted to TikTok and Instagram, regarding DePalma, her nonprofit corporation No Peace No Quiet, Inc., ("NPNQ") and NPNQ's website.  Docs. 33-1 ¶ 1; 40-1 ¶¶ 1-2; 40-2 ¶ 1.  According to DePalma, those statements render the defendants liable for defamation, false light invasion of privacy, and civil conspiracy.  Docs. 33-1 ¶ 1; 40-2 ¶ 1.  Defendant Korslund failed to answer and is in default.  Docs. 14; 17.  The remaining defendants, Adamo and Kirk, now move for summary judgment.  Doc. 33.  For the reasons below, the defendants' motion (Doc. 33) is **GRANTED**.

---

[1] Samantha Adamo was named in the complaint as Samantha "Kerns," which is her ex-husband's last name—though her full name is still apparently Samantha Kerns Adamo according to her deposition.  Doc. 33-45 at 11:17-24.  The Court refers to her as Adamo.

# I.  BACKGROUND

## A.  Factual Background

Drawing inspiration, allegedly, from her own experiences with domestic abuse and the legal system, DePalma decided to advocate for legal reforms.[2]  Docs. 33-1 ¶¶ 1-2; 40-2 ¶¶ 1-2.  To do so, DePalma, a California resident, formed a California nonprofit corporation, NPNQ, to lobby in support of her cause.  Docs. 33-1 ¶¶ 7-9; 40-2 ¶¶ 7-9.  Significant here, NPNQ was not, at the time of the alleged defamatory statements, a 501(c)(3) or 501(c)(4) entity, had not properly filed its Articles of Incorporation or Statement of Information with the California Secretary of State, and was not registered as a lobbyist or registered with California's Registry of Charitable Trusts.  Docs. 33-1 ¶¶ 7-9, 75, 77, 79-81; 40-2 ¶¶ 7-9, 75, 77, 79-81.

### 1.  DePalma Creates the NPNQ Website

In October 2021, DePalma purchased the domain name "nopeacenoquiet.org" through Register.com and used Register.com's website builder to create NPNQ's website.  Docs. 33-1 ¶ 10, 12; 40-2 ¶ 10, 12.  Her website included links to resources for domestic abuse victims, links to NPNQ's social media accounts, links to DePalma's personal social media accounts, and a NPNQ message board operated by a third-party host.  Docs. 33-1 ¶ 16; 40-1 ¶¶ 6, 8; 40-2 ¶ 16.  Access to the message board required users to sign up with an email address, although anyone could otherwise access the website without creating an account.  Doc. 40-1 ¶¶ 6-7.  A form to contact NPNQ also

---

[2] DePalma is an aggressive and prolific advocate.  She has another website, "Liars, Cheaters and Gaslighters" (www.liarscheatersandgaslighters.com), dedicated to domestic abuse advocacy and awareness.  Docs. 33-1 ¶ 11; 40-2 ¶ 11.  DePalma blogs about her experiences with domestic abuse and has written a book also named Liars, Cheaters and Gaslighters.  Docs. 33-1 ¶ 11; 40-2 ¶ 11; *see also* Doc. 33-3 at 40:6-25.  Among other things, DePalma says she teaches others how to initiate legal proceedings for what she considers online bullying and harassment and instructs her viewers to file complaints with their local government officials and Congress.  Doc. 33-3 at 59:12-22.

contained fields for usernames, email addresses, and messages.  Docs. 33-1 ¶ 16; 40-1 ¶ 6; 40-2 ¶ 16.  NPNQ's site "went live" on November 4, 2021.  Docs. 33-1 ¶ 16; 40-1 ¶ 8; 40-2 ¶ 16.

Approximately one month later, DePalma included a link on NPNQ's website to a change.org petition she created in September 2021.  Docs. 33-1 ¶ 23; 40-1 ¶ 9; 40-2 ¶ 23.  DePalma created the "change.org" petition to raise awareness about "coercive control," hoping "ultimately [to] bring the issue to the attention of Congress," and subsequently promoted the petition through her various social media accounts.  Docs. 33-1 ¶¶ 23-24; 40-1 ¶¶ 1-2; 40-2 ¶¶ 23-24.  The petition asks interested persons to sign and provide a donation through change.org's "chip in" feature.  Docs. 33-1 ¶¶ 23-24; 40-2 ¶¶ 23-24.  Apparently "chipped-in donations" would promote the petition, and there is no evidence money "chipped in" would have gone directly to DePalma or NPNQ.  Doc. 40-2 ¶ 23; *see also* Doc. 33-40 at 96:1-15.

Soon after the launch of NPNQ's website, DePalma added a "misconduct ticketing system" ("MTS") to the site.  Docs. 33-1 ¶ 17; 40-2 ¶ 17.  According to DePalma, MTS was created "to facilitate the reporting of abusers taking advantage of social media to post content harassing abuse survivors" and to report this information to lawmakers.  Docs. 33-1 ¶ 18; 40-1 ¶ 10; 40-2 ¶ 18.  Simply put, MTS allowed "a victim of social media harassment [to] submit information regarding their harassment" through a third-party host.  Docs. 33-1 ¶ 18; 40-1 ¶¶ 10, 11; 40-2 ¶ 18.  MTS was officially launched on November 19, 2021.  Docs. 33-1 ¶ 18; 40-1 ¶ 11; 40-2 ¶ 18.

*2.  The Response to DePalma's Promotion of NPNQ through Social Media*

Once NPNQ was launched, DePalma posted several videos about NPNQ and its website on Instagram and YouTube to "bring awareness to an issue" and "get the word out there."  Docs. 33-1 ¶¶ 20-21; 40-2 ¶¶ 20-21.  DePalma also promoted NPNQ on TikTok using the accounts @loveandjustice5 and @nopeacenoquiet.  Docs. 33-1 ¶ 20; 40-2 ¶ 20.  On November 8, 2021, DePalma posted a video to TikTok discussing NPNQ and MTS, which generated roughly 10,000 views.[3]  Docs. 33-1 ¶ 22; 40-2 ¶ 22.  In DePalma's opinion, the video "went viral" and created substantial public interest.  Docs. 33-1 ¶ 22; 40-2 ¶ 22.

On November 27, 2021, Kirk saw one of DePalma's videos on TikTok promoting NPNQ's website and MTS.  Docs. 33-1 ¶ 27; 40-2 ¶ 27.  Kirk discovered DePalma's video while scrolling through the "home" page of Kirk's "secondary account" (@wholesomehealing) and looking at content generated by TikTok's algorithm.  Docs. 33-1 ¶ 27; 40-2 ¶ 27.  Like DePalma, Kirk is a survivor of domestic abuse who creates TikTok content discussing domestic violence, domestic abuse, and narcissism.[4]  Docs. 33-1 ¶¶ 25-26; 40-1 ¶ 15; 40-2 ¶¶ 25-26.  Kirk's education and experience includes an undergraduate degree and Master of Business Administration in finance and a career developing and implementing financial systems software.  Docs. 33-1 ¶ 26; 40-1 ¶ 15; 40-2 ¶ 26.  She estimates that she has worked with seventy to eighty nonprofit

---

[3] In her deposition, DePalma testified the video had 10 million views though she corrected herself later stating it was only 10,000 views.  Doc. 33-3 at 129:2-21; 131:2-8.

[4] Kirk's primary account at the time (@sarcasmqueen) had roughly 63,000 followers.  Doc. 33-40 at 46:11-14.  It says much about this bunch of self-proclaimed victim advocates that one would hold herself out as "the sarcasm queen."

organizations and spent two years consulting with nonprofit businesses regarding

fundraising, financial, accounting, and reporting software.  Docs. 33-1 ¶ 26; 40-2 ¶ 26.

After seeing DePalma's video on TikTok, Kirk visited NPNQ's website "which

raised some questions for her."  Docs. 33-1 ¶¶ 27-28; 40-2 ¶¶ 27-28.  Kirk noticed that

NPNQ's site stated its 501(c)(3) status was pending and had multiple grammatical and

spelling errors.  Docs. 33-1 ¶ 28; 40-2 ¶ 28.  Kirk also noticed many forms on NPNQ's

site which took users to third-party sites, and, in her opinion, MTS was potentially

problematic because it was not clear to whom the collected sensitive information was

being disclosed.  Docs. 33-1 ¶ 28; 40-2 ¶ 28.  On November 27, 2021, Kirk posted two

videos to TikTok which she created by "stitching" portions of DePalma's videos,

interposed with questions about NPNQ and MTS.[5]  Docs. 33-1 ¶ 29; 33-40 at 61:12-25;

40-2 ¶ 29.  According to Kirk, these questions were "typical of the questions she would

ask any organization doing something like what NPNQ was doing based on her

professional experience."  Docs. 33-1 ¶ 30; 40-2 ¶ 30.  Kirk did not contact DePalma

about her questions or concerns before she posted her videos.  Doc. 40-1 ¶ 19.

DePalma saw Kirk's videos on TikTok shortly after they were posted.  Docs. 33-1

¶ 31; 40-2 ¶ 31.  DePalma then posted a series of videos to TikTok responding to Kirk

and answering her questions about NPNQ and MTS.  Docs. 33-1 ¶¶ 32-34; 40-2 ¶¶ 32-

34.  DePalma acknowledged that at that time, "Kirk was just asking questions."  Docs.

33-1 ¶ 32; 40-2 ¶ 32.  She advised Kirk that questions about NPNQ's site could be

---

[5] Apparently, "stitch" is a TikTok content creation tool that allows users to combine another video on
TikTok with a new video created by the user.  Docs. 33-1 ¶ 29; 40-2 ¶ 29.  There is reason to doubt any
of the parties have much of a future as victim advocates, but they have some digital production skills and
a keen desire to use those skills in the worst way.

answered through the site itself and referred Kirk to resources provided on NPNQ's site including domestic violence and suicide prevention hotlines.  Docs. 33-1 ¶¶ 33-34; 40-2 ¶¶ 33-34.

This video was later seen by Adamo, a friend of Kirk, who, like both Kirk and DePalma, has a significant audience on TikTok where she posts about being a survivor of domestic abuse.[6]  Docs. 33-1 ¶¶ 35-36; 40-1 ¶ 21; 40-2 ¶¶ 35-36.  Like Kirk, Adamo saw DePalma's video while scrolling through her "home page" on TikTok.  Docs. 33-1 ¶¶ 27, 35; 40-2 ¶¶ 27, 35.  After seeing DePalma's video, which was posted as a reply to Kirk, Adamo contacted Kirk to see if she was okay, apparently because of DePalma's referral to suicide prevention resources.  Docs. 33-1 ¶ 37; 40-1 ¶ 24; 40-2 ¶ 37.  Kirk told Adamo about DePalma's previous videos and the videos Kirk had posted in response.  Docs. 33-1 ¶ 37; 40-1 ¶ 24; 40-2 ¶ 37.

Around the same time, DePalma posted a separate video to TikTok which included the IP address of an unknown individual who she claimed hacked NPNQ's website.  Docs. 33-1 ¶ 39; 40-2 ¶ 39.  DePalma claims she posted the video to "smoke out" the owner of the IP address.  Docs. 33-1 ¶ 40; 40-2 ¶ 40.  It was later discovered by all parties that the IP address belonged to Defendant Korslund.  Docs. 33-1 ¶ 41; 40-2 ¶ 41.  Korslund was a member of NPNQ's message board until she was blocked.  Docs. 33-1 ¶¶ 41, 43; 40-2 ¶¶ 41, 43.

On a later visit to NPNQ's website Kirk noticed a "Not Secure" icon in the address bar of her browser.  Docs. 33-1 ¶ 44; 40-2 ¶ 44.  It is undisputed that NPNQ's

---

[6] At the time of the alleged defamatory statements, Adamo estimates she had around 300,000 followers. Doc. 40-1 ¶ 21.

website was an "HTTP" site and did not have an SSL certificate until December 28, 2021.  Docs. 33-1 ¶ 74; 40-2 ¶ 74.  All agree that HTTP websites without an SSL certificate "cause a nonsecure site warning to appear in the browser address bar when a user goes to the site."  Docs. 33-1 ¶ 14; 40-2 ¶ 14.  DePalma also acknowledges that according to Register.com: "If your website has been marked with a 'nonsecure site' warning, it is an unsecured site."  Docs. 33-1 ¶ 15; 40-2 ¶ 15.

Kirk then noticed a listing on NPNQ's site seeking a fundraising administrator, which, according to her, "essentially would suggest that the [NPNQ] organization was looking to fundraise money either then or at some point" in the future.  Docs. 33-1 ¶ 45; 40-2 ¶ 45.  This belief stemmed from Kirk's own understanding and "experience with nonprofit organizations, [that] donations happen to be a very large part of their revenue."  Doc. 33-40 at 95:13-15.  DePalma claims NPNQ's site has never had "any information indicating that NPNQ requested or received donations."  Docs. 40-1 ¶ 9; 40-2 ¶ 45.  In fact, DePalma claims that neither she personally nor the organization ever received or "took" any money from third parties for NPNQ and states that she is the only person who has ever "donated" to NPNQ.  Doc. 40-1 ¶ 9.

Shortly after DePalma's video referring Kirk to a suicide prevention hotline, Adamo posted a video to TikTok that incorporated a portion of one of DePalma's videos about MTS.  Docs. 33-1 ¶ 54; 40-2 ¶ 54.  In the video, Adamo stated:

> You're probably one of the most dangerous people I've ever seen on this app.  Who controls this information because you own that app, right? What would stop somebody from making erroneous complaints? Nothing.  This is the kind of shit they do in China.

Docs. 33-1 ¶ 54; 40-2 ¶ 54.  Adamo also included a written comment in the video

stating: "Do not go to this website.  Nothing is ever anonymous."  Docs. 33-1 ¶ 55; 40-2

¶ 55.

Several days later, Adamo posted a second video to TikTok—again incorporating

a portion of one of DePalma's TikTok videos.  Docs. 33-1 ¶ 57; 40-2 ¶ 57.  In this video,

Adamo stated:

> One: If you're a victim of abuse, do not interact with that message board in
> any way.  It's not a secure site.  All legal documentation is still pending.
> Keep your information safe.  She's already posted somebody's IP address
> in an effort to intimidate somebody.  In the meantime, stop taking advantage
> of abuse survivors.

Docs. 33-1 ¶ 57; 40-2 ¶ 57.  DePalma does not dispute that Adamo thought DePalma

"was taking advantage of abuse survivors by holding herself out as a domestic abuse

survivor and then encouraging them to do something which she should know was

dangerous," like providing information that should be protected such as IP addresses,

locations, names, and home addresses.  Docs. 33-1 ¶ 56; 40-2 ¶ 56.  Nor does

DePalma dispute Adamo's assertion that she "thought that [DePalma]'s video posting

the IP address was done to intimidate someone" because Adamo "had a hard time

seeing any other reason why somebody would post somebody's IP address for any

other reason."[7]  Docs. 33-1 ¶ 58; 40-2 ¶ 58.

On November 29, 2021, Kirk posted another video about DePalma.  Docs. 33-1 ¶

47; 40-2 ¶ 47.  In that video, Kirk stated:

> This fucking grandma.  And you can see down at the bottom, there is her–
> again, she doxxed somebody's IP address.  This was somebody that was
> on her website, nonpeacenoquiet.org.  If we take a peek at the top, its' clear
> that this website is not secure.  But again, we can see here that this fucking

---

[7]  Instead, DePalma merely "objects to any insinuation that [Adamo]'s subjective perception of
[DePalma]'s reasoning in posting the video is in anyway true."  Doc. 40-2 ¶ 58.

grandma is doxxing people's IP addresses.  So, no shit, not secure at all.  No encryption, no security for you, the users of the website.  If you decide to go to nopeacenoquiet.org, I highly recommend using a VPN, because obviously this person is not using the data that they're getting for good.  In fact, they're using it to dox people on the internet, which I'm sure is something that's on their little request form.  They say they're a nonprofit organization, but they made a business decision not to get a 501(c)(3).  They've been taking money from people.  Where is that money going? You use information for shitty things, Rachel.  Don't worry, y'all.  Just started digging up dirt on this con artist.

Docs. 33-1 ¶ 47; 40-2 ¶ 47.  The same day, Kirk posted a second video to TikTok

stating:

Her license is also pending.  So, she's running her organization without her license.  And I don't know if that's like her 501(c)(3), like, I'm assuming it's her 501(c)(3), but she's accepting money from other people.  So many red flags.

Docs. 33-1 ¶ 48; 40-2 ¶ 48.

According to Kirk, these remarks were based on her understanding and observations after visiting NPNQ's site.[8]  Docs. 33-1 ¶ 45; 40-2 ¶ 45.  This included a public comment by the TikTok account @my.name.is.elaine stating, "many of us SENT HER [DePalma] MONEY when we signed."[9]  Docs. 33-1 ¶ 46; 40-1 ¶ 40; 40-2 ¶ 46.

---

[8] Kirk also created a website called "No Quiet No Peace," which was a parody of NPNQ's website.  Docs. 33-1 ¶ 49; 40-2 ¶ 49.  The parties refer to this website as the "Hot Dog website" because "the home page included an image of dancing hot dogs and a video of the 'Hot Dog Dance' song from Mickey Mouse Clubhouse."  Docs. 33-1 ¶ 49; 40-2 ¶ 49.  Kirk then posted videos of herself creating the website on TikTok to, in her words, illustrate how to create a website that she deemed safe for users.  Docs. 33-1 ¶ 49; 40-2 ¶ 49.  One page of the "Hot Dog website," for example, was named "Asshole #1" and referred to both DePalma and MTS.  Docs. 33-1 ¶ 50; 40-2 ¶ 50.

[9] After this action was filed, the parties determined that the money referred to by @my.name.is.elaine was a $40.00 donation to the chip-in feature of DePalma's Change.org petition.  Doc. 40-1 ¶ 44.  Although Kirk understood this comment to mean DePalma's change.org petition, she did not follow up with @my.name.is.elaine to confirm until after this lawsuit was filed.  Docs. 33-1 ¶ 46; 40-2 ¶ 46.  Regardless, if this was her understanding, Kirk seems to acknowledge funds "chipped in" would not have been received or deposited in DePalma's account directly; NPNQ itself did not have a bank account until June 2022.  Docs. 33-1 ¶¶ 78-79; 40-2 ¶¶ 78-79; 33-40 at 96:1-15.

## B. Procedural History

DePalma filed her complaint on March 2, 2022, alleging Adamo, Kirk, and Korslund were jointly and severally liable for defamation, false light invasion of privacy, and civil conspiracy.  Doc. 1.  Defendant Korslund failed to answer or otherwise defend, but because Adamo and Kirk were actively defending the case, the Court denied DePalma's motion for default judgment against Korslund without prejudice, subject to renewal if and when it was appropriate to do so.  Docs. 7; 13; 14; 17.  With discovery complete, Adamo and Kirk now move for summary judgment.[10]  Doc. 33.

## II.  STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

---

[10] During discovery, DePalma, Adamo, and Kirk undertook to "litigate" their positions through their respective social media accounts.  They demonstrated considerable ability and eagerness to demean and belittle, and the complete absence of the temperament and compassion of true victim advocates.  The Court ordered each to show cause why they should not be sanctioned for litigation misconduct and ordered the parties to conduct their depositions at the courthouse.  Docs. 20; 21; 22; 23.  Those prophylactic measures were apparently effective, and the remainder of discovery proceeded without further Court intervention.  But that conduct is relevant to the defendants' motion for sanctions (Doc. 42) which is addressed by separate order.

the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P.  56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ….  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

Defendants Kirk and Adamo move for summary judgment on DePalma's claims of defamation, false light invasion of privacy, and civil conspiracy.  Doc. 33.  However, because DePalma bases her false light claim on the allegedly defamatory statements, that claim is subsumed in her defamation claim.  *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 557, 610 S.E.2d 92, 96 n.1 (2005) (explaining if "the statements alleged are defamatory, the claim would be for defamation *only*, not false light invasion of privacy") (emphasis added) (citing *Time, Inc. v. Hill*, 385 U.S. 374, 390-91 (1967).  And because conspiracy is not a separate cause of action, DePalma concedes her claims are all subject to the same standards and defenses.  *See* Doc. 40 at 19; *see Alta Anesthesia Assocs. of Ga., P.C. v. Gibbons*, 245 Ga. App. 79, 85, 537 S.E.2d 388, 394 (2000).  Thus, if the defendants are entitled to summary judgment on DePalma's defamation claim, her claims for civil conspiracy and false light invasion of privacy fail too.

The parties agree Georgia law applies to DePalma's claims.  To establish a claim for defamation, plaintiffs generally must show: (1) a false and defamatory statement of fact about the plaintiff; (2) published without privilege to a third party; (3) fault by the defendant amounting to at least negligence, or, if appropriate, actual malice; and (4) either special harm or actionability of the statement despite lack of special harm.[11]

---

[11] For the fourth element, plaintiffs must either (1) show the statement is defamatory per se, in which case damages are presumed, or (2) present proof of special harm in the form of financial loss or economic injury.  *See Jamison v. First Ga. Bank*, 193 Ga. App. 219, 222, 387 S.E.2d 375, 378 (1989) ("The special damages necessary to support an action for defamation, where the words are not actionable in themselves must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value.").  In Georgia, there are only three categories of defamation per se: statements charging plaintiff with a specific crime; statements charging plaintiff with a contagious disease or "some debasing act which may exclude him from society"; and statements calculated to injure plaintiff in his trade or profession.  O.C.G.A. § 51-5-4; *see Cottrell v. Smith*, 299 Ga. 517, 524, 788 S.E.2d 772,

*American Civil Liberties Union v. Zeh*, 312 Ga. 647, 650, 864 S.E.2d 422, 427 (2021); *see also Johnson v. Lindsay Pope Brayfield & Assocs., Inc.*, 364 Ga. App. 656, 661, 875 S.E.2d 856, 862 (2022).  Whether a particular communication is defamatory is generally a question for the jury—unless the statement is unambiguous and can reasonably have only one interpretation.  *See Speedway Grading Corp. v. Gardner*, 206 Ga. App. 439, 441, 425 S.E.2d 676, 678 (1992).  When determining whether a statement is capable of being defamatory, courts consider how the statement would be construed by an average viewer or listener.  *Lucas v. Cranshaw*, 289 Ga. App. 510, 513, 659 S.E.2d 612, 615 (2008).

Here, the alleged defamatory statements are: (1) NPNQ's website was not secure; (2) NPNQ's legal documentation was pending; (3) DePalma "doxed"; (4) DePalma was taking money from people; and (5) DePalma was a "con-artist" and was dangerous or taking advantage of victims of domestic abuse.[12]  In relevant part, the defendants argue they are entitled to summary judgment because all statements are either true or statements of opinion, and, in any event, DePalma is a limited-purpose

---

781 (2016) (explaining "the requirements for slander per se apply to libel per se because … the definition of slander in Georgia has been incorporated into the definition of libel" (quoting *Cmty. Newspaper Holdings, Inc. v. King*, 299 Ga. App. 267, 270, 682 S.E.2d 346, 349 (2009)).  To be defamatory per se, statements must be "recognized as injurious on their face—without the aid of extrinsic proof" or innuendo. *Wright v. Southern Bell Tel. & Tel. Co., Inc.*, 169 Ga. App. 454, 458, 313 S.E.2d 150, 154 (1984); *see also Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 688, 500 S.E.2d 1, 5 (1998) ("Defamatory words which are actionable per se are those which are recognized as injurious on their face—without the aid of extrinsic proof … if the defamatory character of the words [does] not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo." (second alteration in original)).  In all other cases, proof of special harm is required.

[12] DePalma abandoned any claim with respect to statements not addressed in response to the defendants' summary judgment motion.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

public figure in the online "domestic abuse community" and cannot show the defendants published statements with actual malice.[13]  Doc. 33-2 at 6, 12-13.

## A. Whether Defendants' Statements are Capable of Being Proven False

The defendants claim they are entitled to summary judgment because the alleged defamatory statements are either (1) affirmatively or substantially true or (2) purely opinion and not capable of being proven false.  Doc. 33-2 at 6, 8.  To be actionable, defamatory statements must be false.  *See* O.C.G.A. § 51-5-6 ("The truth of the charge made may always be proved in justification of an alleged libel or slander."). The burden "to prove that a published statement is false rests squarely with the plaintiff."  *Bryant v. Cox Enters.*, Inc., 311 Ga. App. 230, 234, 715 S.E.2d 458, 463 (2011).  Thus, truth is a complete defense, and a cause of action "will lie only for a statement of fact" because "an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false."  *Cottrell v. Smith*, 299 Ga. 517, 523, 788 S.E.2d 772, 781 (2016) (quoting *Gettner v. Fitzgerald*, 297 Ga. App. 258, 261, 677 S.E.2d 149 (2009)).

"As long as the facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth."  *Torrance v. Morris Publishing Group, LLC*, 281 Ga. App. 563, 571, 636 S.E. 2d 740, 746 (2006).  Substantial truth is all that is required.  *Bryant*, 311 Ga. App. at 234, 715 S.E.2d at 463 (explaining defamation law overlooks minor inaccuracies); *see also Jaillett v. Ga. Television Co*., 238 Ga. App. 885, 888, 520 S.E.2d

---

[13] The defendants also argue they are entitled to summary judgment because the alleged defamatory statements are conditionally privileged under Georgia law; and NPNQ and not DePalma is the real party in interest.  Doc. 33-2.  The Court declines to address those arguments.

721, 724 (1999).  A "statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced."[14]  *Bryant,* 311 Ga. App. at 234, 715 S.E.2d at 463; *see also Austin v. PMG Acquisition, LLC*, 278 Ga. App. 539, 541, 629 S.E.2d 417, 420 (2006).

An opinion is defamatory only if it can reasonably be interpreted, "according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false."  *Cottrell*, 299 Ga. at 523, 788 S.E.2d at 781; *see also Bryant*, 311 Ga. App. at 235, 715 S.E.2d at 464.  Where a defendant utters specific statements capable of being proved false in explanation for a negative opinion about the plaintiff, that statement can be the ground for a defamation claim.  *See Elder v. Cardoso*, 205 Ga. App. 144, 145, 421 S.E.2d 753, 755 (1992).  The explanation must have been truthful to avoid potential liability for defamation.  *N. Atlanta Golf Operations, LLC v. Ward*, 363 Ga. App. 259, 263, 870 S.E.2d 814, 819 (2022).  "Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court."  *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1347 (N.D. Ga. 2018) (citing *Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018)).[15]

---

[14] *See Brown v. Capricorn Recs., Inc.*, 136 Ga. App. 818, 819-20, 222 S.E.2d 618, 620 (1975) (affirming summary judgment for defendant on false light claim where element of falsity was absent because "if anyone wished to make an association between [plaintiff] and [the allegedly false representation], they could do so independent of [that representation]" because the basis for defendant's representation of plaintiff "is a true one … [w]hatever innuendos people may draw from such association … is a matter of individual thought processes, not enhanced, abetted, distorted or misrepresented by" defendant).

[15] Although the court in *Turner* was applying Florida law, this proposition is consistent with Georgia law. *See*, *e.g.*, *McCall v. Couture*, 293 Ga. App. 305, 307, 666 S.E.2d 637, 640 (2008); *see also Speedway Grading Corp*, 206 Ga. App. at 439, 425 S.E.2d at 678.

1.  *Statements that NPNQ's Website was Not Secure*

The defendants argue they are entitled to summary judgment because any statement related to NPNQ's site being "unsecure" is either wholly or substantially true and thus nonactionable.  Doc. 33-2 at 4-6, 8.  They argue that any statement about the "security" of NPNQ's website are true because the site did not obtain an SSL certificate until the end of 2021—after the defendants' statements were made.  Docs. 33-2 at 6-8; 33-1 ¶ 74; 40-2 ¶ 74.

DePalma does not dispute that an SSL certificate was not installed on NPNQ's website until late December—and before then the site remained "*unsecured* and unencrypted."  Docs. 33-1 ¶ 74; 40-2 ¶ 74 (emphasis added).  Instead, DePalma argues that "the context in which the statements are made create a distinctly different impression as to the truth of the allegations and reflect they are, in fact," false.[16]  Doc. 40 at 5.  DePalma contends that taken in context the defendants insinuated NPNQ's site was "unsecure" not just because it lacked an SSL certificate but also because "all legal documentation was still pending"; and, as the site's owner, DePalma is, implicitly, untrustworthy and would misuse information produced by the site.  *Id.*  at 5-6.  DePalma argues this created a false impression she was running a scam or fraud on others.  *Id.*

DePalma's spin notwithstanding, it is undisputed that NPNQ's website was an HTTP only site, lacked an SSL certificate, and was branded "Not Secure" by a warning in the address browser bar.  Docs. 33-1 ¶¶ 13-15; 40-2 ¶¶ 13-15.  DePalma herself acknowledges that the site she used to create and publish NPNQ's website explained

---

[16] To the extent that DePalma argues the third-party hosts operating NPNQ's message board and MTS were or are secured by "defendants' standards," she also argues "secure website" is not defined by defendants.  Doc. 40-2 ¶ 13.  Regardless, it is still undisputed users were presented with a "Not Secure" warning when visiting NPNQ's website.  Docs. 33-1 ¶¶ 13-15; 40-2 ¶¶ 13-15.

that: "If your website has been marked with a 'nonsecure site' warning, *it is an unsecured site*."  Docs. 33-1 ¶ 15; 40-2 ¶ 15 (emphasis added).  Thus, the defendants' explanation for their "negative opinion" that NPNQ's website was unsecure because it lacked an SLL certificate cannot give rise to a defamation claim where the facts for such opinion are undisputedly true.

In sum, the explanation for the defendants' negative perception about the security of NPNQ's website is an opinion to which reasonable minds can differ.  The defendants' opinion was also based on facts that are at least substantially true (*i.e.*, lack of an SSL certificate, pending legal documentation, and the public disclosure of an IP address obtained through the site).  *See* Docs. 33-1 ¶¶ 13-15, 39-40, 56-58; 40-2 ¶¶ 13-15, 39-40, 56-58.  Thus, DePalma's claims for those statements fail.

   *2.  Statements that NPNQ's Legal Documentation was Pending*

The defendants argue they are entitled to summary judgment because any statement that NPNQ's legal documentation was "pending" is covered by the defense of truth or substantial truth.  Doc. 33-2 at 6-8.  DePalma largely fails to address these arguments.  *See* Doc. 40.  The Court nevertheless addresses them to the extent DePalma relies on them to suggest the defendants' other statements were somehow defamatory or cast her in a false light.

The defendants claim that, at the time their statements were made, it is undisputed DePalma had not completed the legal requirements necessary for operating a California nonprofit corporation.  Doc. 33-2 at 5-6.  At her deposition, DePalma was asked whether it was a true statement that: "at the time that any  statements about [NPNQ]'s legal documentation being pending were made," "a *substantial portion* of

[NPNQ's] documentation" was "all *pending* and *incomplete*" including (1) "registration with the  California Registry of Charitable Trusts"; (2) "[filing] th[e]  statement of information for [her] corporation [NPNQ]"; (3) filling for and/or approval of NPNQ's "tax-exempt status"; (4) necessary "amendments to [NPNQ's] articles of incorporation"; and (5) "registration as a lobbyist."  Doc. 33-3 at 111:13-21 (emphasis added).  DePalma refused to answer directly, but she admitted "[she] was working on trying to get all of that documentation completed"—conceding it had not yet been done.[17]  Doc. 33-3 at 112:12-19.  For example, NPNQ's 501(c)(4) status as a lobbying organization was not approved until August 3, 2022—five months after DePalma filed this action.  *See* Docs. 33-1 ¶¶ 76, 78-79; 40-2 ¶¶ 76, 78-79.

In sum, any statements that NPNQ's legal documentation was "pending" is either true or substantially true, and thus nonactionable.

### 3.  Statements that DePalma "Doxed" Someone's IP Address

The defendants also contend the defense of truth or substantial truth covers any statement that DePalma "doxed" someone's IP address.  Doc. 33-2 at 6-8.  Because it is undisputed that DePalma posted an individual's IP address that she obtained through NPNQ's website to social media, the defendants argue any statement that DePalma doxed people is at least substantially true and nondefamatory.  *Id.*; s*ee also* Doc. 40 at 5.  In response, DePalma argues defendants' use of the word "dox" "changes the gist or sting" of the statements, despite admitting that she "posted" the IP address of an individual she obtained through NPNQ's site to "smoke out" the identity of its owner.  Docs. 33-1 ¶ 40; 40 at 4-5; 40-2 ¶ 40.  "Dox," she argues, insinuated that by publicly

---

[17] This was in response to the follow up question: "But do you agree that any comment about your legal documentation being pending would be a true statement?"  Doc. 33-3 at 112:12-14.

posting an IP address without more, DePalma enabled third parties to identify a victim of domestic abuse who engaged with NPNQ's site, which according to her "is simply not true." Doc. 40 at 5. But again, the defendants' perceptions to the contrary about whether DePalma doxed anyone are "subjective assessment[s] as to which reasonable minds could differ."[18] *Gettner*, 297 Ga. App. at 261, 677 S.E.2d at 153.

Although the parties cite different (though similar) dictionary definitions of "dox," defendants argue they are entitled to summary judgment under either or both meanings. *See* Docs. 40 at 5; 41 at 5. In other words, the parties disagree not on the facts underlying whether DePalma "doxed" anyone but whether the undisputed facts amount to "doxing." Citing the Cambridge Dictionary, DePalma argues, "dox" means "to publish private information about someone on the internet, without their permission and in a way that reveals their name, where they live, etc." Doc. 40 at 5. But DePalma did just that; she admittedly posted the IP address to social media to "smoke out," or discover, the name and identity of the owner, an effort that was apparently successful because the IP address was eventually identified as Korslund's.[19] Docs. 33-1 ¶¶ 40-41; 40-2 ¶ 40-41.

Because DePalma did not know whose IP address she doxed, she seems to argue an issue of fact exists as to whether she posted the IP address for "intimidation purposes." Doc. 40 at 10. But it is undisputed DePalma posted the IP address to

---

[18] It is undisputed (1) that defendants were able to identify Korslund as the owner of the IP address after it was posted, and (2) that Korslund is both a victim and survivor of domestic abuse who engaged with NPNQ's site. Docs. 33-1 ¶¶ 39, 41-43; 40-2 ¶¶ 39, 41-43.

[19] The Merriam Webster Dictionary, on which the defendants rely, defines "dox" as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." Doc. 41 at 5. Under either definition, DePalma "doxed."

"smoke out" the identity of the owner.  Docs. 33-1 ¶ 40; 40-2 ¶ 40.  So, although Korslund's identity may have been unknown to DePalma when she posted the IP address to TikTok, there is no dispute that she attempted to force the disclosure of the owner.[20]  Docs. 33-1 ¶ 40; 40-2 ¶ 40.  Thus, to the extent "dox" implies an improper purpose or intent to influence others, the defendants are still entitled to summary judgment for statements that DePalma "doxed" someone's IP address.

### 4. *Kirk's Statements that DePalma Accepted Money*

Kirk argues she is entitled to summary judgment because any statement that "DePalma accepted money" or took money from people is "admittedly and irrefutably true."  Doc. 33-2 at 6-8.  While it is true that Kirk saw a post "many of us SENT HER [DePalma] MONEY when we signed," it turned out there is evidence of only one donation to DePalma's change.org petition.  Docs. 33-1 ¶¶ 24, 46; 40 at 3; 40-1 ¶¶ 40, 44; 40-2 ¶¶ 24, 46.  DePalma claims that neither she personally nor NPNQ as an organization ever "took" or received money from third parties and she is the only person who has ever "donated" to NPNQ.[21]  Doc. 40-1 ¶ 44.

---

[20] Any suggestion by the defendants that DePalma publicly disclosed someone's IP address "for intimidation purposes" also is itself an opinion.  *See Gettner*, 297 Ga. App. at 261, 677 S.E.2d at 153.  DePalma herself acknowledges this by emphasizing Adamo "had speculated that the IP was posted in an effort to intimidate someone based upon her perception of the tone of [DePalma]'s video."  Docs. 33-1 ¶ 57; 40-2 ¶ 57.  DePalma does not dispute Adamo's testimony that she "thought that [DePalma]'s video posting the IP address was done to intimidate someone" because Adamo "had a hard time seeing any other reason why somebody would post somebody's IP address for any other reason."  Docs. 33-1 ¶ 58; 40-2 ¶ 58.

[21] It is unclear whether the defendants dispute that DePalma is the only person who has donated to NPNQ, though it seems they do not.  *See* Docs. 41 at 3; 33-2 at 8.

The Court cannot rule as a matter of law that Kirk's statements that DePalma accepted money are true.  Thus, Kirk is not entitled to summary judgment for these statements on the grounds that her statements were substantially true.

### 5.  Statements that DePalma was a "Con-Artist" and was Dangerous or Abusive

The defendants argue they are entitled to summary judgment because any statement that DePalma was dangerous, or otherwise abusive, is clearly an expression of opinion or hyperbole which is not actionable defamation.  Doc. 33-2 at 8-9.  They further contend statements that DePalma was a con-artist are not actionable under Georgia law.  Doc. 33-2 at 9 (citing *Cottrell*, 299 Ga. at 529, 788 S.E.2d at 784; *Johnson*, 364 Ga. App. at 656, 875 S.E.2d at 856; *Swanson Towing & Recovery, LLC v. Wrecker 1, Inc.*, 342 Ga. App. 6, 11, 802 S.E. 2d 300, 305 (2017)).[22]

According to DePalma, "there is no blanket rule" establishing that the phrase "con-artist" is opinion or hyperbole.  Doc. 40 at 8.  Instead, DePalma argues that when taken in context Kirk's characterization of her as a con-artist "can be found to imply that [DePalma] was obtaining money through fraud or otherwise acting deceitful."  Doc. 40 at 8 (citing *Yancey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989)).  Because fraud is a criminal offense, DePalma claims Kirk's statement is defamatory per se.  Doc. 40 at 9.

First, Kirk's con-artist caricature is preceded by a long list of concerns about NPNQ and the bases for those concerns.  *See Jaillett*, 238 Ga. App. at 890, 520 S.E.2d at 726 (holding "[i]f an opinion is based upon facts already disclosed in the

---

[22] Specifically, the defendants rely on *Swanson Towing & Recovery, LLC v. Wrecker 1, Inc.*, 342 Ga. App. 6, 8, 802 S.E.2d 300, 303 (2017) for its holding that statements the plaintiff "has no morals" and was a "mean, vulgar, demeaning crook" were merely expressions of opinion and unactionable.  Doc. 33-2 at 8, 9.  There, the court explained that for the characterization of the plaintiff as mean, vulgar and demeaning to be defamatory, the term "crook" would need to imply specific criminal activities—which the defendants claim is absent here.

communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts.").  Because Kirk specified the reasons for her negative perceptions of DePalma as a con-artist and as dangerous or abusive, whether Kirk's statements are actionable turn on whether the basis given for those opinions can be proven false.  *See* Docs. 33-1 ¶¶ 45, 56, 58-59; 40-2 ¶¶ 45, 56, 58-59.  The Court has already explained why the bases for Kirk's opinions are not capable of being disproven, *e.g.*, holding NPNQ out as a nonprofit before it had obtained 501(c)(3) status; promoting the change.org petition through NPNQ; and collecting and disclosing sensitive personal information.[23]  *See* Docs. 33-1 ¶¶ 39-40, 47-48, 56-58; 40-2 ¶¶ 39-40, 47-48, 56-58.

Nor are the defendants' opinions defamatory per se.  DePalma argues Kirk's use of the term "con-artist" implies criminal activity by way of fraud and deceit and is thus defamatory per se.  Doc. 40 at 10.  But statements imputing a crime are not defamatory per se unless they give the impression that a specific crime has been charged against the individual and are couched in language reasonably expected to convey that meaning to a hearer of the statement.  *Taylor v. Calvary Baptist Temple*, 279 Ga. App. 71, 73-74, 630 S.E.2d 604, 606-07 (2006).  A vague statement or even a derogatory

---

[23] For instance, DePalma argues Adamo had no basis for her belief that DePalma was dangerous simply because she "controlled" personal information about abuse victims and survivors through NPNQ's "Contact Us" form.  Doc. 40 at 19.  But insofar as DePalma contends the defendants suggested her control of information implied an inherent intent to misuse, this is a matter of opinion based on her disclosure of Korslund's IP address.  *See Gettner*, 297 Ga. App. at 261, 677 S.E.2d at 153.  Because the explanation for this negative opinion is undisputed, DePalma cannot meet her burden to show falsity.  It is also undisputed that "at the time of the statements at issue and conduct giving rise to [DePalma]'s claims, she was the sole individual involved with NPNQ and creator of the website, moderator of the message board, and recipient of all information through … MTS."  Docs. 33-1 ¶ 19; 40-2 ¶ 19.  Thus, all agree DePalma in fact controlled the information.

one does not amount to slander or libel per se when a person cannot reasonably conclude from what is said that the comments are imputing a crime to the plaintiff.  *Id.*

Here, Kirk's statement: "Don't worry, y'all.  Just started digging up dirt on this con-artist" does not imply the commission of a specific criminal offense or that a specific crime is being charged.  DePalma argues the statement "can be found to imply that [she] was obtaining money through fraud or otherwise acting deceitful," but when taken as a whole, as DePalma urges the Court to do, the statement does not convey that Kirk claimed DePalma committed a specific crime.  Doc. 40 at 8.  Kirk stated she had just started looking into DePalma, and she intended to share any "dirt" this recent undertaking uncovers which she did not already have.  Docs. 33-1 ¶ 47; 40-2 ¶ 47.  While DePalma emphasizes this video was posted "against the backdrop of Kirk's clearly negative feelings about [her]," this not only suggests the statement is an opinion, but it also undercuts any argument that Kirk's statement imputes a specific crime given the obvious bias or dislike toward DePalma.  Docs. 33-1 ¶ 47; 40-2 ¶ 47.  Thus, Kirk's use of the term con-artist to refer to DePalma is not couched in such language as might reasonably be expected to convey a specific crime has been committed or that a specific crime is being charged against her and, as a result, is not defamatory per se.

In sum, the explanation for the defendants' negative perception of DePalma as a con-artist and dangerous or abusive is an opinion to which reasonable minds can differ.  Further, that opinion was based on facts that are at least substantially true.  *See* Docs. 33-1 ¶¶ 39-40, 47-48, 56-58; 40-2 ¶¶ 39-40, 47-48, 56-58.  Thus, DePalma's claims for those statements fail.

**B.  Whether DePalma is a Limited Purpose Public Figure**

Although Kirk's statements that DePalma accepted money have not been proved true as a matter of law, Kirk argues she is still entitled to summary judgment because DePalma is a limited public figure and there is no evidence Kirk published statements with actual malice. [24]  *See Zeh*, 312 Ga. at 650, 864 S.E.2d at 428 (explaining the First Amendment requires public figure plaintiffs to show defendants published defamatory statements with actual malice instead of ordinary negligence); *see also Gettner*, 297 Ga. App. at 261, 677 S.E.2d at 154.  To determine whether an individual is a limited-purpose public figure courts: (1) "isolate the public controversy," (2) "examine the plaintiff's involvement in the controversy" and (3) "determine whether the alleged defamation was germane to the plaintiff's participation in the controversy."  *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 817, 555 S.E.2d 175, 183 (2001).

*1.  Public Controversy*

The first step of the limited-purpose public figure test requires the Court to identify "a public controversy, which 'must be more than merely newsworthy.'"  *Ladner v. New World Commc'ns of Atlanta, Inc*., 343 Ga. App. 449, 806 S.E.2d 905, 911 (2017).  "[I]t is not the global nature of the public's interest that defines a dispute as a public controversy, but rather whether the issue generates discussion, debate, and dissent in the relevant community[.]"  *Mathis v. Cannon*, 276 Ga. 16, 24, 573 S.E.2d

---

[24] Courts have recognized two types of public figures: (1) "general-purpose public figures" who are public figures in all settings; and (2) "limited-purpose public figures" who are public figures in only limited circumstances.  *See Riddle v. Golden Isle Broad., LLC*, 275 Ga. App. 701, 704-06, 621 S.E.2d 822, 825-26 (2005).  General-purpose public figures "hold positions with such pervasive fame or power that they are deemed public figures for all purposes." *Mathis v. Cannon*, 276 Ga. 16, 22, 573 S.E.2d 376, 381 (2002).  An individual may also be a limited-purpose public figure if she "'voluntarily injects [her]self or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'"  *Id*. (quoting *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 351 (1974)).

376, 382 (2002).  In other words, "'if the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.'"  *Riddle*, 275 Ga. App. at 705, 621 S.E.2d at 826 (quoting *Silvester v. Am. Broad. Cos*., 839 F.2d 1491, 1494-95 (11th Cir. 1988)).  Courts must look only to those controversies that already existed in the public arena before the alleged defamation.  *Jewell*, 251 Ga. App. at 817, 555 S.E.2d at 183.

According to DePalma, the defendants "fail to present any argument or evidence supporting the threshold issue: that a 'public controversy' pre-existed their engagement with [DePalma] and into which [she] has 'thrust' herself."  Doc. 40 at 15.  DePalma argues that the only controversy here was created by the defendants, and that neither her activities, nor her website, "were the subject of a controversy already debated in the public arena" before the defendants' defamatory attacks.  *Id*.  DePalma misunderstands the meaning of "controversy" in this context.  *See Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) ("It is no answer to the assertion that one is a public figure to say … that one doesn't choose to be. It is sufficient … that [the plaintiff] voluntarily engaged in a course that was bound to invite attention and comment.");[25] *see also Silvester,* 839 F.2d at 1496 (explaining "occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome," but "[u]nless he rejects any role in the debate, he too has invited comment relating to the issue at hand." (internal quotation omitted)).

---

[25] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

By her own admission, DePalma "had already managed to generate a great deal of publicity for No Peace No Quiet, Inc., and … MTS before Ms. Kirk or Ms. Adamo said a single word about" her.[26]  *See* Doc. 33-3 at 130:2-7.  DePalma also acknowledges that she publicly promoted NPNQ and its MTS on social media after her initial video "went viral" and many people were very interested in NPNQ and using MTS.  Doc. 33-3 at 129:2-4.  DePalma's "fame" was such that Kirk learned of DePalma while simply scrolling through her own homepage.  Docs. 33-1 ¶¶ 22, 27; 40-2 ¶¶ 22, 27; 33-3 at 130:8-11.  That viral video "raised some questions" for Kirk and prompted her to respond directly by posting a video she "stitched" to the original on her own TikTok account with 63,000 followers asking questions about NPNQ and MTS.  Docs. 33-1 ¶¶ 22, 27-29; 40-2 ¶¶ 22, 27-29; 33-40 at 46:11-14.  Thus, it is not true that neither DePalma's activities, nor her website, "were the subject of a controversy already debated in the public arena" before the defendants' alleged defamatory attacks.

Further, DePalma considers herself a lobbyist for domestic abuse and undertook efforts through NPNQ to lobby Congress and state legislatures to change the law, which she perceived as offering inadequate protections for domestic abuse victims.  Docs. 33-1 ¶¶ 2, 81; 40-2 ¶¶ 2, 81.  The entire point of lobbying any legislature, establishing a nonprofit organization to do so, and seeking 501(c)(4) status in furtherance thereof—as DePalma has done here—is in part to influence the resolution of certain issues that will have substantial ramifications.  Opposing or advocating for legislation is the epitome of an issue that generates public discussion, debate, and dissent within the relevant community.  *See Mathis*, 276 Ga. at 24, 573 S.E.2d at 382.  Because opposing and

---

[26] When asked specifically DePalma answered: "I was able to get people's attention with it, yes."  Doc. 33-3 at 130:2-7.

advocating for legislation necessarily implicates issues being publicly debated which have foreseeable and substantial ramifications for nonparticipants, DePalma's lobbying efforts through NPNQ involved a pre-existing public controversy.

In sum, the need for greater protection of domestic abuse victims was already being publicly debated and has foreseeable and substantial consequences beyond just the parties to this case.  As part of that discussion, NPNQ and MTS generated substantial interest, before any statements now at issue in this case.  Thus, a public controversy pre-existed the defendants' alleged defamatory statements.

2.  *Plaintiff's Involvement*

The second prong of the limited-purpose public figure test requires the Court to examine the plaintiff's involvement in the controversy.  *See Cottrell*, 299 Ga. at 525, 788 S.E.2d at 782 (holding plaintiff was a limited-purpose public figure "in the spheres of running [an organization] and Christian evangelism").  A plaintiff in a defamation case may be deemed a limited-purpose public figure "if [s]he purposefully tries to influence the outcome of a public controversy or, because of h[er] position in the controversy, could realistically be expected to have an impact on its resolution."  *Jewell*, 251 Ga. App. at 817, 555 S.E.2d at 184.  Courts may consider the plaintiff's past conduct, the extent of any press coverage and the public reaction to the plaintiff's conduct when making this assessment.  *Id.*  The Court "must examine these factors as they existed before the alleged defamation was published."  *Id*.  Importantly, "[w]hether a person has voluntarily injected [her]self into a public controversy in order to have an impact on its outcome cannot be determined solely by reference to the actor's subjective motives."  *Id*.  at 818, 555 S.E.2d at 184-85.  Instead, the Court must determine "whether a

reasonable person would have concluded that [the actor] would play or was seeking to play a major role in determining the outcome of the controversy." *Id.*

Here, DePalma, through her considerable social media activism, intentionally thrust herself into a public controversy over domestic abuse to influence and address what she perceived to be inadequacies in existing law. [27]  *See* Docs. 33-1 ¶¶ 20-22; 40-2 ¶¶ 20-22.  DePalma's life admittedly revolves around bringing awareness to issues surrounding domestic abuse, which itself weighs against a finding that she is merely a private person.  Docs. 33-1 ¶ 2; 40-2 ¶ 2; 1 ¶ 7.  Her self-proclaimed mission is to raise awareness for victims of domestic abuse and ultimately bring related issues to the attention of Congress.  Doc. 40-1 ¶ 1.  To that end, DePalma has created at least two public websites about domestic abuse.  Docs. 33-1 ¶¶ 11-12; 40-2 ¶¶ 11-12.  She maintains numerous social media accounts and a YouTube channel dedicated to domestic abuse.  Docs. 33-1 ¶¶ 10-11, 21; 40-2 ¶¶ 10-11, 21.  She has written and sought to self-publish a book about domestic abuse and her own experiences with domestic abuse.  Docs. 33-1 ¶ 11; 40-2 ¶ 11; 33-3 at 40:6-25.  She has incorporated a nonprofit organization dedicated to domestic abuse and further created and maintained a related change.org petition.  Docs. 33-1 ¶¶ 2, 23-24; 40-2 ¶¶ 2, 23-24.  DePalma even "teaches" others how to initiate legal proceedings for online bullying and harassment and encourages them to file complaints with their local and federal legislators.  Doc.  33-

---

[27] While DePalma argues her video was not brought to Kirk's attention by any TikTok user within her "community," or brought to her attention by another TikTok user raising questions or commenting about DePalma or MTS, this does not somehow negate the existence of a public controversy, and Kirk's actions are irrelevant with respect to DePalma's own preexisting involvement in a public controversy.  Doc. 40-1 ¶ 16.

3 at 59:12-22.  The clear purpose of her advocacy and self-promotion is to generate public attention and to support and to stimulate public debate.

As a content creator on social media, DePalma seeks public validation of her ideas, and it is sufficient that she voluntarily engaged in a course that was bound to invite attention and comment.[28]  *See Jewell*, 251 Ga. App. at 816, 555 S.E.2d at 183 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324-25 (1974)).  DePalma urges the public to join her cause and engage in specific conduct—contacting legislators; signing her change.org petition; and reporting domestic abuse either to politicians or on MTS and NPNQ's message board.  *See* Docs. 33-1 ¶¶ 2, 23-24; 40-2 ¶¶ 2, 23-24.  These issues are of considerable public importance and effect a wide range of people beyond the parties in this case.

Social media personalities like DePalma very much play a public role and are better equipped to deal with criticism than the average social media user.  *See Jewell*, 251 Ga. App. at 819, 555 S.E.2d at 185 (citing *Gertz*, 418 U.S. at 351).  Unlike the average user, DePalma did not lack effective opportunities for rebuttal; she used "self-help" by taking to social media directly to defend herself against the defendants' allegedly defamatory remarks.  *See Gertz*, 418 U.S. at 344 (explaining public figures usually enjoy significantly greater access to effective channels of communication to combat false information); *see also Silvester*, 839 F.2d at 1495-96 ("*Gertz* and its progeny clearly state that relative ease of access to the media is one of two factors by which public and private figures can be distinguished from each other.").  Dealing with

---

[28] Georgia courts have held even a single interview given to the media may be sufficient to establish a defamation plaintiff as a limited-purpose public figure.  *See Atlanta Humane Soc. v. Mills*, 274 Ga. App. 159, 618 S.E.2d 18 (2005).

criticism, even when crude or distasteful, is one cost of projecting one's life on social media.  Just as other public figures "voluntarily expose themselves to increased risk of injury," DePalma thrust herself into a public controversy by writing to politicians, becoming a lobbyist, and publicly posting and promoting content to social media about her lobbying efforts and NPNQ.  *See* Docs. 33-1 ¶¶ 2, 23-24; 40-2 ¶¶ 2, 23-24.  In short, DePalma intentionally inserted herself into the public sphere to influence opinions on issues of public controversy and is a limited purpose public figure with respect to statements related to her involvement therein.

   *3.  Germaneness*

   The final factor "requires the court to ascertain whether the allegedly defamatory statements were germane to [the plaintiff's] participation in the controversy."  *Jewell*, 251 Ga. App. at 819, 555 S.E.2d at 185.  This is a low bar—"[a]nything which might touch on the controversy is relevant."  *Id*.  "[A] publication is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff."  *Id*.

   Here, all allegedly defamatory statements, including statements that DePalma accepted money, concern DePalma's very public activities and the public platforms she created and promoted to further her causes.  Docs. 33-1 ¶¶ 2, 23-24; 40-2 ¶¶ 2, 23-24.  The public resources DePalma created and publicly promoted, like NPNQ and MTS, for victims of domestic abuse not only have foreseeable and substantial ramifications for nonparticipants—but also are what led to the defendants' statements in the first place.  *See* Docs. 33-1 ¶¶ 31, 37; 40-2 ¶¶ 31, 37.  Because the defendants' statements that NPNQ's website were unsafe, NPNQ's legal documentation was pending, and DePalma

was taking money from people "might help the public decide how much credence should be given to" her, their publication is germane to DePalma's participation in the public controversy generated by her activism. *Jewell*, 251 Ga. App. at 820, 555 S.E.2d at 185.

## C. Whether DePalma can Prove Publication with Actual Malice

Because DePalma is a limited purpose public figure, she must present evidence Kirk published statements that she accepted money with actual malice to prevail. Although DePalma bears the burden of proof at trial, on summary judgment, defendants in a defamation case must negate the plaintiff's claim of actual malice "by establishing that [she] lacked knowledge … the defamatory matter was false or did not publish it with reckless disregard as to whether it was false or not." *Torrance*, 289 Ga. App. at 138, 656 S.E.2d at 152. Once a defendant carries this burden, a plaintiff must "come forward with evidence of malice so as to create a jury issue on this claim." *Ladner*, 343 Ga. App. at 457-58, 806 S.E.2d at 914.

Actual malice requires actual knowledge that a statement is false or reckless disregard for the truth. *See Krass v. Obstacle Racing Media, LLC*, —— F. Supp. 3d —— –, 2023 WL 2587791, at *23 (N.D. Ga. Mar. 21, 2023) (citing *Davis v. Shavers*, 225 Ga. App. 497, 484 S.E.2d 243, 248 (1997)). It requires clear and convincing proof that a defendant was aware of the likelihood she was circulating false information. *See Bryant*, 311 Ga. App. at 236, 715 S.E.2d at 464 (collecting cases); *see also Davis*, 225 Ga. App. at 497, 484 S.E.2d at 248. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further

investigation.  *Cottrell*, 299 Ga. at 525-26, 788 S.E.2d at 782.  The evidence must show that a defendant in fact entertained serious doubts as to the truth of her statements or failed to act to purposefully avoid learning the truth.  *Mills*, 274 Ga. App. at 165, 618 S.E.2d at 24; *see also Zeh*, 312 Ga. at 673, 864 S.E.2d at 442 (explaining "there must be a showing by clear and convincing evidence that the defendant" purposefully avoided "investigation with the intent to prevent discovering the truth" (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692-93 (1989)).

DePalma argues because "Kirk testified that she based her statements off of a single comment online from a third party, unknown to Kirk," that "we gave [DePalma] money when we signed," there: (1) were "obvious" reasons to doubt @my.name.is.elaine's statement that "many of us SENT HER [DePalma] MONEY when we signed"; and (2) a question of fact exists as to whether Kirk purposefully avoided further investigation with the intent to avoid learning the truth.  Docs. 33-1 ¶ 46; 40 at 15; 40-1 ¶ 40; 40-2 ¶ 46.  First, taken alone the statement "we gave [DePalma] money when we signed" is sufficient to support a subjective belief that DePalma accepted money from people.  Second, Kirk did not testify that her remarks were based on that one comment.  Docs. 33-1 ¶ 46; 40 at 15; 40-1 ¶ 40; 40-2 ¶ 46.  Instead, it is undisputed that Kirk's remarks were also based on (1) her understanding and observations after revisiting NPNQ's site; and (2) Kirk's own understanding and "experience with nonprofit organizations, [that] donations happen to be a very large part of their revenue."  Docs. 33-1 ¶ 45; 33-40 at 95:5-15; 40-2 ¶ 45.  Although DePalma "objects" to Kirk's subjective belief "to the extent … a website seeking a fundraising administrator, which has no information about providing donations or ability to do the same, is suggesting that the

organization is looking to fundraise," that misses the point, which is that Kirk held the subjective beliefs she claimed.  Docs. 33-1 ¶ 45; 40-2 ¶ 45.  There is no evidence that Kirk actually knew DePalma was not accepting money or that Kirk subjectively entertained doubts this was true when she posted her statements.  Docs. 33-1 ¶ 45; 33-40 at 95:5-15; 40-2 ¶ 45.  For limited purpose public figures, Kirks's subjective belief controls the issue of actual malice.

Had DePalma challenged Kirk's subjective belief, she would have failed.  Accepting money from other people and organizations is something non-profit organizations commonly do.  Kirk testified that she understood @my.name.is.elaine's comment to refer to DePalma's change.org petition.  Doc. 33-40 at 97:1-15.  When asked specifically about her understanding of change.org and its chip in feature, Kirk acknowledged that DePalma would not have received funds "chipped in" directly nor would they have been deposited into her bank account.  *Id.* at 96:3-15.  Given her knowledge of nonprofit accounting, however, Kirk still testified her belief was that there should have been "some accounting for that."  *Id.* at 96:1-15.  For Kirk, this raised "so many red flags" because NPNQ had not obtained 501(c)(3) status but was soliciting or encouraging others to make donations to a petition created by DePalma and promoted by NPNQ.  Docs. 33-1 ¶¶ 47-48; 40-2 ¶¶ 47-48.  These facts, which are undisputed, support Kirk's subjective belief.  *See* Docs. 33-1 ¶¶ 28, 47-48, 76, 78-79; 40-2 ¶¶ 28, 47-48, 76, 78.  There is no evidence Kirk purposely ignored an obvious fact with the intent to avoid learning the truth.[29]

---

[29] To the extent DePalma argues Kirk should have known the statement that DePalma was taking money is false, the standard for actual malice is subjective, not objective.  *See Brewer v. Rogers*, 211 Ga. App. 343, 348, 439 S.E.2d 77, 81 (1993) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  Actual malice is measured by Kirk's actual subjective assessment and her belief in the truth of her statements.

In short, there is no evidence, much less clear and convincing evidence, suggesting that Kirk subjectively entertained any doubt as to the truth of her statements. Thus, Kirk is entitled to summary judgment for those statements. The defendants are entitled to summary judgment for all other statements because it is undisputed these statements were either true or merely matters of opinion and cannot be proven false. Because DePalma is a limited purpose figure, the defendants are entitled to summary judgment on DePalma's claims for all statements for the additional reason that there is no evidence the defendants subjectively entertained doubt as to their truth.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (Doc. 33) is **GRANTED**.[30]


**SO ORDERED**, this 21st day of September, 2023.

S/ Marc T.  Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

*See Miller*, 180 Ga. App. at 448, 349 S.E.2d at 507; *see also Torrance*, 289 Ga. App. at 140, 656 S.E.2d at 156 ("failure to investigate fully or to the degree desired by the plaintiff 'does not evince actionable reckless disregard.'" (quoting *Brewer*, 211 Ga. App. at 348, 439 S.E.2d at 82)).

[30] Because DePalma's claims fail on the merits, the defendants' *Daubert* motion (Doc. 34) is **DENIED** as moot.